**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § § § | **COMPLAINT FOR FORFEITURE *IN REM*** |
| **v.** | § § | |
| **APPROXIMATELY 1,230,899.742474 USDT** | § § § § | *CIVIL ACTION NO.* **26-cv-2543** |
| **Defendant, *in rem.*** | § | |

**VERIFIED COMPLAINT FOR FORFEITURE *IN REM***

Plaintiff, the United States of America, through the U.S. Attorney for the District of Columbia, brings this verified complaint for forfeiture in a civil action *in rem* against 1,230,899.742474 USDT, hereinafter referred to as "**Defendant Property**", and alleges as follows:

**STATEMENT OF THE CASE**

1.  Criminals believed to be located abroad, their associates, and conspirators together stole funds from multiple U.S. victims. The funds were then laundered through a series of virtual currency addresses, and sometimes virtual currency exchanges, to evade detection and hide the origin of the funds. The **Defendant Property** constitutes proceeds traceable to those thefts and property involved in, and traceable to, this money laundering scheme.

2.  The United States of America seeks to lawfully forfeit the **Defendant Property** to punish and deter criminal activity by depriving criminals of property used in or acquired through illegal activities, and most importantly, to recover assets that may be used to compensate victims.[1]

---

[1] *See* United States Asset Forfeiture Program, *Our Mission*, https://www.justice.gov/afp.

## JURISDICTION AND VENUE

3.      This Court has original jurisdiction of this civil action by virtue of 28 U.S.C. § 1345 because it has been commenced by the United States and by virtue of 28 U.S.C. § 1355(a) because it is an action for the recovery and enforcement of a forfeiture under an Act of Congress.

4.      This Court has *in rem* jurisdiction over the **Defendant Property** under 28 U.S.C. § 1355(b).

5.      Venue is proper in this judicial district under 28 U.S.C. § 1355(b)(2) because the property is subject to forfeiture under the laws of the United States and is controlled by Tether International S.A. de C.V. ("Tether"), which is domiciled in the country of El Salvador.

## NATURE OF THE ACTION AND STATURY BASIS FOR FORFEITURE

6.      The United States files this *in rem* forfeiture action to seek forfeiture of **Defendant Property** as constituting proceeds of wire fraud and wire fraud conspiracy offenses, committed in violation of 18 U.S.C. §§ 1343, 1349, 2, and 3, and as involved in money laundering and money laundering offenses, committed in violation of 18 U.S.C. 1956(a)(1)(B)(i), 1956(h), 2, and 3.

7.      Procedures for this action are mandated by Rule G of the supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions and, to the extent applicable, 18 U.S.C. §§ 981 and 983 and the Federal Rules of Civil Procedure.

8.      18 U.S.C. § 981(a)(1)(A) mandates forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of section 18 U.S.C. §§ 1956, 1957 or 1960, or any property traceable to such property.

9.      18 U.S.C. § 981(a)(1)(C) mandates forfeiture of property constituting or derived from proceeds traceable to wire fraud, conspiracy to commit wire fraud, or any offense constituting "specified unlawful activity" as defined by 18 U.S.C. § 1956(c)(7), or a conspiracy to commit such

offense. A violation of 18 U.S.C. § 1343, or a conspiracy to commit that offense, constitutes specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A) as an offense listed in 18 U.S.C. § 1961(1)(B).

10.     18 U.S.C. § 1343 provides that whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, commits the violation of wire fraud.

11.     18 U.S.C. § 1349 provides that whoever attempts or conspires to commit a violation of 18 U.S.C. § 1343 shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

12.     18 U.S.C. § 1956(a)(1)(B)(i) provides in relevant part that whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity— . . . knowing that the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity" is guilty of concealment of money laundering.

13.     18 U.S.C. § 1956(a)(2)(B)(i) provides that whoever transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument or funds from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States—knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of

unlawful activity and knowing that such transportation, transmission, or transfer is designed in whole or in part—to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity, commits international money laundering.

14.     18 U.S.C. § 1956(h) provides that any person who conspires to commit any offense of 1956 or 1957 is subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.

## **PROPERTY INFORMATION**

15.     The **Defendant Property** is approximately 1,230,899.742474 USDT, which is the approximate equivalent to $1,230,899.742474 in U.S. dollars (USD).  The **Defendant Property** is associated with the following virtual currency addresses, with these addresses together being referred to as the "**SUBJECT VIRTUAL CURRENCY ADDRESSES**:"

    a. TJZCvwVJDGBtwhyfUKd98yFftCMN25mq7d     ("**SUBJECT VIRTUAL CURRENCY ADDRESS 1**"), which held approximately 579,473.5985 USDT.

    b. TXiA3ouHKGDQMYrXgUQpN492a7g9CVgxSL     ("**SUBJECT VIRTUAL CURRENCY ADDRESS 2**"), which held approximately 346,543.0526 USDT.

    c. TTReR6JzDfzanfiHuUK9928WbSGogvUdsH     ("**SUBJECT VIRTUAL CURRENCY ADDRESS 3**"), which held approximately 123,003.5 USDT.

    d. TSHW7NJbsNCTrKUsSnCmTZftqQNcgpKPtA     ("**SUBJECT VIRTUAL CURRENCY ADDRESS 4**"), which held approximately 25,000 USDT.

    e. THV7iXCnJ56Mqtj1zTWfXGZdX81GLgmVuX     ("**SUBJECT VIRTUAL CURRENCY ADDRESS 5**"), which held approximately 25,000 USDT.

    f. TChrDn3FbGf6yQVFS8ZPffFfAv2hHgBAeC     ("**SUBJECT VIRTUAL CURRENCY ADDRESS 6**"), which held approximately 131,879.5914 USDT.

16. The virtual currency associated with the **SUBJECT VIRTUAL CURRENCY ADDRESSES** is hereinafter referred to as the "**Defendant Property**."

17. The United States has yet to take custody and control over the **Defendant Property**, which is held, and was voluntarily frozen by, Tether.

### DEFINITIONS

18. **Virtual Currency:** Virtual currencies are digital representations of value that, like traditional coin and paper currency, function as a medium of exchange (i.e., they can be digitally traded or transferred, and can be used for payment or investment purposes). Virtual currencies are a type of digital asset separate and distinct from digital representations of traditional currencies, securities, and other traditional financial assets. The exchange value of a particular virtual currency generally is based on agreement or trust among its community of users. Some virtual currencies have equivalent values in real currency or can act as a substitute for real currency, while others are specific to particular virtual domains (e.g., online gaming communities) and generally cannot be exchanged for real currency. Cryptocurrencies, like Bitcoin and Ether, are types of virtual currencies, which rely on cryptography for security. Cryptocurrencies typically lack a central administrator to issue the currency and maintain payment ledgers. Instead, cryptocurrencies use algorithms, a distributed ledger known as a blockchain, and a network of peer-to-peer users to maintain an accurate system of payments and receipts.

19. **Blockchain:** A blockchain is a digital ledger run by a decentralized network of computers referred to as "nodes." Each node runs software that maintains an immutable and historical record of every transaction utilizing that blockchain's technology. Many digital assets, including virtual currencies, publicly record all their transactions on a blockchain, including all of the known balances for each virtual currency address on the blockchain. Blockchains consist of

blocks of cryptographically signed transactions, and blocks are added to the previous block after validation and after undergoing a consensus decision to expose and resist tampering or manipulation of the data. There are many different blockchains used by many different virtual currencies. For example, Bitcoin in its native state exists of the Bitcoin blockchain, while Ether (or "ETH") exists in its native state on the Ethereum network.

20.    **Blockchain Analysis:** Law enforcement can trace transactions on blockchains to determine which virtual currency addresses are sending and receiving particular virtual currency. This analysis can be invaluable to criminal investigations for many reasons, including that it may enable law enforcement to uncover transactions involving illicit funds and to identify the person(s) behind those transactions. To conduct blockchain analysis, law enforcement officers use reputable, free open source blockchain explorers, as well as commercial tools and services. These commercial tools are offered by different blockchain-analysis companies. Through numerous unrelated investigations, law enforcement has found the information associated with these tools to be reliable.

21.    **Virtual Currency Address:** A virtual currency address is an alphanumeric string that designates the virtual location on a blockchain where virtual currency can be sent and received. A virtual currency address is associated with a virtual currency wallet.

22.    **Virtual Currency Exchange:** A virtual currency exchange ("VCE"), also called a virtual currency exchange, is a platform used to buy and sell virtual currencies. VCEs allow users to exchange their virtual currency for other virtual currencies or fiat currency, and vice versa. Many VCEs also store their customers' virtual currency addresses in hosted wallets. VCEs can be centralized (i.e., an entity or organization that facilitates virtual currency trading between parties

6

on a large scale and often resembles traditional asset exchanges like the exchange of stocks) or decentralized (i.e., a peer-to-peer marketplace where transactions occur directly between parties).

23.    **Virtual Currency Wallet:** A virtual currency wallet (*e.g.,* a hardware wallet, software wallet, or paper wallet) stores a user's public and private keys, allowing a user to send and receive virtual currency stored on the blockchain. Multiple virtual currency addresses can be controlled by one wallet.

24.    **Unhosted Wallet:** An unhosted wallet, also known as a self-hosted, non-custodial wallet, is a virtual currency wallet through which the user has complete control over storing and securing their private keys and virtual currency. Unhosted wallets do not require a third party's involvement (*e.g.,* a virtual currency exchange) to facilitate a transaction involving the wallet. Unhosted wallets allow users to generate and manage their own unhosted wallet addresses.

25.    **Transaction Fee:** A transaction fee is a fee paid by the party sending virtual currency on a blockchain to reward miners and/or validators for verifying and validating transactions. Transaction fees vary by blockchain and can fluctuate based on factors such as blockchain network traffic and transaction sizes. Senders of virtual currency can increase the transaction fees that they pay to have their transactions confirmed faster by miners and/or validators. Transaction fees are generally paid in a blockchain's native token (*e.g.*, Bitcoin on the Bitcoin blockchain). On the Ethereum network, these transaction fees are called "gas fees." Gas fees are transaction costs paid in Ether ("ETH"), or its fraction, gwei. These fees serve as a form of remuneration for validators who maintain and secure the network. Gas fees fluctuate based on supply, demand, and network capacity, and may increase during periods of network congestion.

26.    **Stablecoins:** Stablecoins are a type of virtual currency whose value is pegged to a commodity's price, such as gold, or to a fiat currency, such as the U.S. dollar, or to a different

virtual currency. For example, Tether (also known as USDT) is a stablecoin pegged to the U.S. dollar. Stablecoins achieve their price stability via collateralization (backing) or through algorithmic mechanisms of buying and selling the reference asset or its derivatives.

27.    **Tether:** Tether International S.A. de C.V. ("Tether") is the company that manages the smart contracts and the treasury (i.e., the funds held in reserve) for USDT tokens.

28.    **Ether:** Ether ("ETH") is a virtual currency that is the native token used by the Ethereum blockchain, which is a blockchain with smart contract functionality.

29.    **Tron:** Tron is a blockchain with smart contract functionality.

30.    **USD Coin:** USD Coin ("USDC") is a "stablecoin" virtual currency with its value tied to the US dollar. USDC is issued by Circle Internet Financial, LLC.

## STATEMENT OF FACTS

### Background on Cryptocurrency Investment Fraud

31.    The USSS is investigating cryptocurrency investment fraud ("CIF") schemes, often referred to as "pig-butchering," a term derived from the Chinese-language word used to describe this scheme and its treatment of victims. In 2024 alone, more than 41,000 complaints of CIF were received by the Federal Bureau of Investigation's Internet Crime Complaint Center (IC3), resulting in $5.8 billion in reported losses.[2] CIF schemes are often orchestrated by Asia-based criminal syndicates, predominately operating in southeast Asia.

32.    In CIF schemes, criminals contact potential victims through seemingly misdirected text messages, dating applications, or other online platforms/forums with the goal of building rapport and relationships with the victims.

---

[2] *See* Fed. Bureau of Investigation, Internet Crime Report 2024 at 36, https://www.ic3.gov/AnnualReport/Reports/2024_IC3Report.pdf.

33.    Once that trust is established, the criminal recommends virtual currency investment by touting their own, or an associate's success in the field. Investment methods vary, but a common tactic is to direct a victim to a fake investment platform hosted on a website. These websites, and the investment platforms hosted there, are created by criminals to mimic legitimate platforms. The subject usually instructs and/or assists the victim with opening an account on a centralized virtual currency exchange, such as Coinbase or Crypto.com, and then walks the victim through transferring money from a bank account to that virtual currency exchange account. Next, the victim will usually receive instructions on how to transfer their virtual currency assets to the fake investment platform. On its surface, the platform typically shows lucrative returns, encouraging further investment. However, all deposited funds are actually routed to a virtual currency address controlled by the criminals.

34.    In CIF schemes, the subjects will continue to encourage investments until victims have depleted their savings. Oftentimes, the subject will attempt to continue the scheme by coaching victims on taking out loans against their homes or borrowing money from friends and family. Inevitably, these victims generally run out of money and make attempts to withdraw their funds. However, victims are unable to do so and are provided various excuses as to why. For example, subjects will often levy a fake "tax" requirement, stating taxes must be paid on the proceeds generated from the platform. This is just an eleventh-hour effort by subjects to elicit more money from victims; ultimately, victims are locked out of their accounts and lose all their funds. Even when victims procure enough funds to pay these "taxes," the subjects will continue to concoct new excuses and fees for victims to pay.

**Overarching CIF Investigation Involving the SUBJECT VIRTUAL CURRENCY ADDRESSES**

35.    This investigation began when a victim ("**Victim-VP**") reported to the USSS that he had fallen victim to a cryptocurrency investment fraud scheme in which he had sent over $950,000 to cryptocurrency addresses provided by an unidentified suspect on a fraudulent investment website.

36.    By investigating this fraudulent investment platform, investigators were able to identify and trace other cryptocurrency transactions that were connected to at least one other victim. This victim was also tricked into depositing cryptocurrency into addresses provided by the fraudulent investment platforms, similar to the one by which **Victim-VP** was scammed. The funds from identified victims were then traced into the **SUBJECT VIRTUAL CURRENCY ADDRESSES**.

37.    In sum, based on the victims' reports, investigation of the fraudulent investment platforms they used, and the tracing of those victims' funds to the **SUBJECT VIRTUAL CURRENCY ADDRESSES**, the funds contained in the **SUBJECT VIRTUAL CURRENCY ADDRESSES** are believed to be proceeds of CIF wire fraud schemes. Described further below, these proceeds are commingled with funds involved in the concealment as part of a money laundering scheme. Therefore, the funds in **SUBJECT VIRTUAL CURRENCY ADDRESSES** are subject to forfeiture as further set forth in this complaint.

**Victim-VP**

38.    In or around November 2025, **Victim-VP** discovered a fraudulent application, IB Capital (IBCapital[.]vip), which presented itself as a legitimate investment platform.[3] **Victim-VP**

---

[3] There is a legitimate UK-based investment company, Islandbridge Capital, which uses the web domain "IB-Capital[.]com." Perpetrators of CIF schemes often use names similar to existing companies to make their scheme appear more legitimate.

subsequently communicated with an individual who went by the name Caroline, who represented herself as an "Assistant" with IB Capital and convinced **Victim-VP** to deposit cryptocurrency into the platform. **Victim-VP** communicated with Caroline via WhatsApp.[4]

39.     **Victim-VP** began investing funds into the platform by conducting wire transfers to scammer bank accounts in addition to purchasing and sending cryptocurrency into addresses provided by the scammers. Due to the purported returns on his investment which were visible on the fraudulent investment platform and communication from the subjects, **Victim-VB** continued to deposit additional funds into the platform.

40.     Throughout a cryptocurrency investment fraud scheme, perpetrators often instruct the victim to access a portal to view the alleged investment activity. In these schemes, these websites often do not correlate to any legitimate account but are exclusively designed to further the investment scheme by making the investment appear legitimate. While the victim is shown a large profit, his funds are often deposited to cryptocurrency addresses under the control of the perpetrators.

41.     In or about April 2026, when the platform showed **Victim-VP**'s balance was approximately $2,000,000, **Victim-VP** attempted to withdraw funds from his account. The subjects further instructed **Victim-VP**, via email, that in order to withdraw his funds, he would need to pay additional fees including an approximate $180,000 reverification payment.

42.     Perpetrators of cryptocurrency investment fraud schemes commonly ask victims to pay "withdrawal fees" to retrieve what victims believe to be investment profits. Perpetrators of these schemes typically continue to request additional deposits until the victim is unable to

---

[4] WhatsApp is a communications platform with end-to-end encryption. This encryption makes this platform a common means of communication in cryptocurrency scams.

continue making payments or becomes overtly suspicious of the perpetrators. Typically in this type of scheme, there is no legitimate method for a victim to withdraw his funds.

43.    Once **Victim-VP** made the requested "reverification payment", the subjects ceased all communication with **Victim-VP**. As of June 2026, **Victim-VP** has not been able to contact the individuals associated with the fraudulent investment platform.

44.    **Victim-VP** provided investigators with a list of cryptocurrency transactions, with approximate dollar amounts, they made at the direction of or due to the promises of the unknown subjects (Exhibit 1). Investigators utilized the Last In, First Out method of accounting to trace these funds, and ultimately contacted Tether to voluntarily blocklist the **SUBJECT VIRTUAL CURRENCY ADDRESSES**.[5]

### Exhibit 1 – Transactions Made by Victim-VP as Part of the CIF Scheme

| Date | Transaction Hash | Amount in USD |
|---|---|---|
| 02/06/26 | 0x851bb8fddebb1abcc818d323e492dba3c23e19ade8d7a16eb16c41678dee575c | $ 60,236.06 |
| 02/13/26 | 0xf7f7ff4f984f6d0d324f84a9d4483f434173c73b17172ed5d68027699c63f2f6 | $ 179,781.72 |
| 02/23/26 | 0xecf814195f485914422acd80c6522c30745e7af6e111836576129985b856617e | $ 125,987.41 |
| 02/25/26 | 0xa8881ffc0d2c8aa803f47da0f72553cc54c0099fd381a4be8c5b74ce23a68748 | $ 75,343.43 |
| 03/02/26 | 0xf616b8f2f44ca6c53703c0aba8535efcfb26bbe1b6470b373cab9b42402d8233 | $ 103,509.16 |
| 03/09/26 | 0x1532bcaca79a623d7ec6d8a7254cba0c4cbbd378c84971fd567916e3912b1ca7 | $ 62,133.93 |
| 03/16/26 | 0x930a7484001a65a28c426f2049da2c6fa65882ae75e685d1978d49c4b3d22216 | $ 125,999.51 |
| 03/19/26 | 0xc2236fda4350b7a616182305914cb69f3f3027852c31ea01e1d7f8b0dbad1750 | $ 78,242.43 |
| 04/14/26 | 0x6a1f8215da4e2a684790cbdbf6c912bbba1d476be77bd60699848b71f095e96f | $ 143,862.62 |
| | Total | $ 955,096.27 |

---

[5] Last In, First Out is a method of inventory accounting in which the most recent items are sold before older items. In cryptocurrency tracing, funds which enter an address most recently are included in transfers out of the address prior to funds which have been in the address for a longer period of time. This tracing method is hereinafter referred to as "LIFO."

## SUBJECT VIRTUAL CRYPTOCURRENCY ADDRESS 1

45.     **Victim-VP** advised investigators he deposited approximately 143,885.44 USDC on or about April 14, 2026, to an address provided by the scammers, 0xc7760118c4fdb27e315501dd02d7858ebc3083a3 ("0xc776").[6]

46.     On April 15, 2026, the approximately 143,885.44 USDC was transferred to 0xfb874e7bf559106027af3e6e62401bbcfc14dcc3 ("0xfb87"). Continuing on the same day, the USDC was included in a transfer of approximately 148,513 USDC to 0xcc2168c817d5f71cd538f0e7c564689d1df6c8b2 ("0xcc21") and a subsequent transfer of 200,000 USDC to 0x40e845741c0591048ab840e94708197a654005d5 ("0x40e8").

47.     On April 16, 2026, the USDC was converted to USDT utilizing the decentralized virtual currency exchange HiFiSwap.[7] Continuing on April 16, 2026, approximately 327,920.59 USDT was deposited to **SUBJECT VIRTUAL CURRENCY ADDRESS 1**. By LIFO, approximately 143,000 USDT of **Victim-VP**'s initial deposit was included in this transfer to **SUBJECT VIRTUAL CURRENCY ADDRESS 1**.

48.     Exhibit 2, below, illustrates how **Victim-VP**'s funds were laundered into **SUBJECT VIRTUAL CURRENCY ADDRESS 1** using a string of virtual currency addresses. The dotted line in Exhibit 2, and in other exhibits in this complaint, represents a swap between different cryptocurrency assets.

---

[6] Transaction hash 0x6a1f8215da4e2a684790cbdbf6c912bbba1d476be77bd60699848b71f095e96f

[7] Investigators confirmed this conversion and all other subsequent HifiSwap uses mentioned using the transaction search feature on the HifiSwap website, https://hifiswap.io/search.

**Exhibit 2 – Summary of the Flow of Funds from Victim-VP to SUBJECT VIRTUAL CURRENCY ADDRESS 1**



49.    On May 27, 2026, Tether confirmed to investigators that Tether voluntarily froze the USDT in **SUBJECT VIRTUAL CURRENCY ADDRESS 1**. The balance of USDT at the time of the freeze was approximately 579,473.598537 USDT. Investigators determined that the total amount of **Victim-VP's** funds which were deposited into the address, approximately 143,000 USDT, or about 25% of the USDT balance, currently remains in the address and is included in the **Defendant Property**.

### SUBJECT VIRTUAL CURRENCY ADDRESS 2

50.    **Victim-VP** advised investigators he deposited approximately 62,139 USDC on or about March 9, 2026, to an address provided by the scammers, 0x15d8df5bb8c4f9b4c12e859465df8d6b4805fc05 ("0x15d8").[8]

51.    On March 10, 2026, **Victim-VP**'s USDC was included in consecutive transfers to 0xfb87, 0xcc21, and 0x40e8.

---

[8] Transaction hash 0x1532bcaca79a623d7ec6d8a7254cba0c4cbbd378c84971fd567916e3912b1ca7.

52.     On March 18, 2026, the USDC was converted to USDT utilizing the decentralized virtual currency exchange HiFiSwap and was deposited as USDT into TEiZ7r9sAfrLc5BpUE5KQgD8LN5tj8sd9y ("TEiZ") in a transaction of approximately 89,623.21 USDT.

53.     On May 16, 2026, approximately 14,120 USDT was transferred from TEiZ to TXiA3ouHKGDQMYrXgUQpN492a7g9CVgxSL, which is **SUBJECT VIRTUAL CURRENCY ADDRESS 2**. On May 22, 2026, an additional approximate 150,000 USDT was transferred from TEiZ to **SUBJECT VIRTUAL CURRENCY ADDRESS 2**. By LIFO, approximately 65,400 USDT of **Victim-VP**'s initial deposit was included in these transfers to **SUBJECT VIRTUAL CURRENCY ADDRESS 2**.

54.     On May 27, 2026, Tether confirmed to investigators that Tether had voluntarily frozen the USDT in **SUBJECT VIRTUAL CURRENCY ADDRESS 2**. The balance of USDT at the time of the freeze was approximately 346,543.05 USDT. Investigators determined that of the total amount, approximately 65,400 USDT, of **Victim-VP's** funds which were deposited into the address, approximately 46,000 USDT, or about 13% of the USDT balance, currently remains in the address and is included in the **Defendant Property**.

55.     Exhibit 3, below, illustrates how **Victim-VP**'s funds were laundered into **SUBJECT VIRTUAL CURRENCY ADDRESS 2** using a string of virtual currency addresses.

**Exhibit 3 – Summary of the Flow of Funds from Victim-VP to SUBJECT VIRTUAL CURRENCY ADDRESS 2**



56.     Investigators back-traced the frozen funds in **SUBJECT VIRTUAL CURRENCY ADDRESS 2** to identify other potential victims whose funds make up a portion of the frozen amount. Investigators determined at least 68,000 USDT of the total amount of funds frozen in **SUBJECT VIRTUAL CURRENCY ADDRESS 2** likely originate from U.S. based victims, bringing the total amount of known and suspected victim funds held in **SUBJECT VIRTUAL CURRENCY ADDRESS 2** to approximately 114,000 USDT, or about 33% of the USDT balance of the address.

57.     Investigators believe these funds originate from potential U.S. victims due to the funds flowing in a manner consistent with the identified victim's funds and commingling with known victim funds.  The majority of these funds pass through the same consolidation address, 0xcc21, and use services to swap victim deposits into USDT. The funds which do not pass through 0xcc21,        approximately        6,000        USDT,        pass        through        an        address, 0x6b82675e7310a4eb79fe00d33c28bc464d055b41   ("0x6b8"),   which   was   first-funded[9]   by 0xcc21.

_____

[9] An address which "first-funds" another address "activates" it by sending cryptocurrency to a

58.     These suspected funds all originate from U.S.-based virtual currency exchanges. Typically, funds that originate from U.S. VCEs are victims' deposits into CIF schemes, as U.S. VCEs are subject to "Know Your Customer" and Anti-Money Laundering regulations which make it more difficult for subjects to launder funds through a U.S.-based VCE.

59.     Exhibit 4, below, illustrates how the suspected victim funds were laundered into **SUBJECT VIRTUAL CURRENCY ADDRESS 2** using a string of virtual currency addresses.

**Exhibit 4 – Summary of the Flow of Funds from Suspected Victims to SUBJECT VIRTUAL CURRENCY ADDRESS 2**



**SUBJECT VIRTUAL CURRENCY ADDRESS 3**

60.     **Victim-VP** advised investigators he deposited approximately 78,244.15 USDC on or about March 19, 2026, to an address provided by the scammers, 0x079e98b7b66df45ab87c6baa0104cffa1495e3ec ("0x079e").[10]

61.     On March 20, 2026, approximately 78,244.15 USDC was transferred to 0xfb87. Continuing on the same day, the USDC was included in a transfer of approximately 153,871 USDC to 0xcc21 and a subsequent transfer of 230,000 USDC to 0x40e8.

---

previously unused address. Typically, the owner of one cryptocurrency address will "first-fund" other addresses under his own control or another user who is known to him.
[10] Transaction hash 0xc2236fda4350b7a616182305914cb69f3f3027852c31ea01e1d7f8b0dbad1750.

62.    On March 21, 2026, the USDC was converted to USDT utilizing the decentralized virtual currency exchange HiFiSwap and deposited into TPP3dGxq819Ah3YeZL6ggtBPaB3jbxpZre ("TPP3").

63.    On May 5, 2026, approximately 226,457 USDT was transferred to TEiZ. On May 24, 2026, 62,800 USDT was deposited to **SUBJECT VIRTUAL CURRENCY ADDRESS 3**. Approximately 54,000 USDT of **Victim-VP**'s initial deposit was included in this transfer to **SUBJECT VIRTUAL CURRENCY ADDRESS 3**.

64.    On May 27, 2026, Tether confirmed to investigators that Tether voluntarily froze the USDT in **SUBJECT VIRTUAL CURRENCY ADDRESS 3**. The balance of USDT at the time of the freeze was approximately 123,003.50 USDT. Investigators determined that the total amount of **Victim-VP's** funds which were deposited into the address, approximately 54,000 USDT, or about 44% of the USDT balance, currently remains in the address and is included in the **Defendant Property**.

65.    Exhibit 5, below, illustrates how **Victim-VP**'s funds were laundered into **SUBJECT VIRTUAL CURRENCY ADDRESS 3** using a string of virtual currency addresses.

**Exhibit 5 – Summary of the Flow of Funds from Victim-VP to SUBJECT VIRTUAL CURRENCY ADDRESS 3**



**SUBJECT VIRTUAL CURRENCY ADDRESS 4 and
SUBJECT VIRTUAL CURRENCY ADDRESS 5**

66.     **Victim-VP** advised investigators he deposited approximately 126,000 USDC on or about March 16, 2026, to an address provided by the scammers, 0xc7760118c4fdb27e315501dd02d7858ebc3083a3 ("0xc776").[11]

67.     On April 21, 2026, the USDC was transferred to 0x40e845741c0591048ab840e94708197a654005d5 ("0x40e8"). On April 22, 2026, the USDC was converted to USDT utilizing the decentralized virtual currency exchange HiFiSwap and deposited into TEiZ.

68.     On May 13, 2026, three transactions totaling approximately 45,000 USDT were deposited into THVn1XN78Js7aAkpJSPU2xiLRHb7sgmVuX ("THVn"). Continuing on the same day, the funds were transferred to TPNHSX1LPWir87cmMRdYLQ5uJJWTUZ2JFT ("TPNH") and again included in a 38,700 USDT transfer from TPNH to TDfwXHvC3NQdMccZsXFfwzzTHQM9UtFy37 ("TDfw").

69.     On May 18, 2026, approximately 25,000 USDT was transferred from TDfw to **SUBJECT VIRTUAL CURRENCY ADDRESS 4**. Approximately 21,400 USDT of **Victim-VP**'s initial deposit was included in this transfer to **SUBJECT VIRTUAL CURRENCY ADDRESS 4**.

70.     On May 27, 2026, Tether confirmed to investigators that Tether voluntarily froze the USDT in **SUBJECT VIRTUAL CURRENCY ADDRESS 4**. The balance of USDT at the time of the freeze was approximately 25,000 USDT. Investigators determined that the total amount of **Victim-VP's** funds which were deposited into the address, approximately 21,400 USDT, or

---

[11] Transaction hash 0x930a7484001a65a28c426f2049da2c6fa65882ae75e685d1978d49c4b3d22216.

about 86% of the USDT balance, currently remains in the address and makes up a portion of the **Defendant Property**.

71.     On May 20, 2026, victim funds which were held in TEIZ were included in an additional transaction of approximately 30,000 USDT to TSnMPBdpqtdbpEXcnPBfT1WUWFBQCzSyFF ("TSnM"). Continuing on May 20, 2026, approximately 30,000 USDT was transferred to **SUBJECT VIRTUAL CURRENCY ADDRESS 5**. Approximately 17,000 USDT of **Victim-VP**'s initial deposit was included in this transfer to **SUBJECT VIRTUAL CURRENCY ADDRESS 5**.

72.     On May 27, 2026, Tether confirmed to investigators that Tether had voluntarily frozen the USDT in **SUBJECT VIRTUAL CURRENCY ADDRESS 5**. The balance of USDT at the time of the freeze was approximately 25,000 USDT. Investigators determined that the total amount of **Victim-VP's** funds which were deposited into the address, approximately 17,000 USDT, or about 68% of the USDT balance, currently remains in the address and makes up a portion of the **Defendant Property**.

73.     Exhibit 6, below, illustrates how **Victim-VP**'s funds were laundered into **SUBJECT VIRTUAL CURRENCY ADDRESS 4** and **SUBJECT VIRTUAL CURRENCY ADDRESS 5** using a string of virtual currency addresses.

**Exhibit 6 – Summary of the Flow of Funds from Victim-VP to SUBJECT VIRTUAL CURRENCY ADDRESS 4 and SUBJECT VIRTUAL CURRENCY ADDRESS 5**



**Victim-MH**

74.    Investigators identified **SUBJECT VIRTUAL CURRENCY ADDRESS 6** while tracing the funds of **Victim-VP**. The USDT stored in the address was back-traced to U.S. based exchanges and the initial deposit addresses were queried on complaint databases including the FBI's Internet Crimes Complaint Center ("IC3") and Federal Trade Commission's ("FTC") Consumer Sentinel systems. This query identified complaints on both IC3 and Consumer Sentinel from **Victim-MH**. In June 2026, investigators telephonically interviewed **Victim-MH**.

75.    In or around March 2026, **Victim-MH** was contacted by an individual on WhatsApp advertising a "Pre-Market Trading Group." When **Victim-MH** joined the WhatsApp group, he found approximately 20 individuals advertising their alleged success using a purported investment platform, m[.]oddofortune[.]com.

76.    An individuals known as "Elena Whitmore," who claims to be the trading group's assistant, encouraged **Victim-MH** to earn VIP status by depositing large investments into the

21

platform. The assistant provided wire information and a cryptocurrency deposit address to **Victim-MH**. **Victim-MH** reports having deposited approximately $100,000 into the investment platform, consisting of deposits of both wire transfer and cryptocurrency transactions.

77.     In or around March 2026, **Victim-MH** attempted to withdraw approximately $30,000 from the investment platform. In the following days, **Victim-MH** was informed by the subjects that he is required to pay an additional $48,000 in fees or his account would be locked. Exhibit 7, below, shows a screenshot **Victim-MH** provided of his "unpaid amount," payments the scammer required from the victim in order for him to withdraw funds. As of June 2026, **Victim-MH** has not received any further communication from the subjects and has not been able to withdraw any funds.

**Exhibit 7 – Screenshot of Platform Provided by Victim-MH**



78.     **Victim-MH** provided the below transactions by which **Victim-MH** sent funds at the directions of the subjects (Exhibit 8).

**Exhibit 8 – Transactions Made by Victim-MH as Part of the CIF Scheme**

| Date | Transaction Hash | Amount in USD |
|---|---|---|
| 03/20/26 | 0x2814e8f6aca8a27a9458d5b329939723d79eefdef94a93a597edd1205b32ddc5 | $ 25,723.00 |
| 03/23/26 | 0xdd484719aa9182d8d463310a25596a8358843f0d442314ab455fd6e88384862c | $ 2,581.00 |
| 03/31/26 | 0xd6816384dcb07b812f88e2341ae8eaea072abf46ea6f23346ae2b5b082818956 | $ 2,305.00 |
| 03/31/26 | 0x3719bd598573c5c2bed50fcca42e5eb4385d9cbd0cdf8cd2e7ea54f97ee5041c | $ 32,304.00 |
| | Total | $ 62,913.00 |

**SUBJECT VIRTUAL CURRENCY ADDRESS 6**

79.    **Victim-MH** reported he deposited approximately $62,000 worth of ETH, in or around March of 2026, to a cryptocurrency address provided by the scammers. **Victim-MH** sent the funds from his Kraken, a U.S.-based VCE, account to the address 0x9296e53626cd827dec4e8d75cb4cf0a46e34feb8 ("0x9296").

80.    On March 31, 2026, the totality of the funds was transferred to 0xaf2fe89e8b0d1b85597ca9b280ef37bf7f43f435 ("0xaf2f"), where they were commingled with other suspected victim funds.

81.    On or around March 31, 2026, the ETH was transferred to 0xcc21and 0x40e8. On April 6, 2026, the ETH was converted to USDT utilizing the decentralized virtual currency exchange HiFiSwap and deposited into TPP3.

82.    On May 4, 2026, approximately 400,000 USDT, which included approximately 25,000 USDT from **Victim-MH**'s initial ETH deposits, was transferred to TEIZ. Continuing on the same day, approximately 236,400 USDT was transferred to TKDRsa7vk2mnxWUV4ZfMCXXJybm8nHpCkh ("TKDR").

83.    On May 4, 2026, approximately 66,400 USDT from TKDR was transferred to **SUBJECT VIRTUAL CURRENCY ADDRESS 6.** This transaction into **SUBJECT VIRTUAL**

**CURRENCY ADDRESS 6** was comprised of approximately 25,000 USDT from **Victim-MH**'s initial deposits.

84.    Investigators determined a portion of funds from **Victim-VP** were also transferred and currently remain in **SUBJECT VIRTUAL CURRENCY ADDRESS 6**. From the flow of funds outlined in regard to **SUBJECT VIRTUAL CURRENCY ADDRESS 3**, approximately 2,000 USDT of **Victim-VP**'s funds were commingled with **Victim-MH**'s funds in the May 4, 2026, transaction of 236,400 USDT from TEiZ to TKDR.

85.    On May 27, 2026, Tether confirmed to investigators that Tether voluntarily froze the USDT in **SUBJECT VIRTUAL CURRENCY ADDRESS 6**. The balance of USDT at the time of the freeze was approximately 131,879.59 USDT. Investigators determined that of the total amount of funds which were deposited and remain in the address, approximately 27,000 USDT, or about 20% of the current USDT balance, is traced from identified victim transactions and make up a portion of the **Defendant Property**.

86.    Through tracing of cryptocurrency, investigators also identified 17 transactions totaling approximately $188,000 from Kraken which consolidated into the same cryptocurrency address as **Victim-MH**. Based on blockchain analysis, investigators believe that these funds are attributable to unknown victims. Approximately 39,000 USDT of these funds flow into **SUBJECT VIRTUAL CURRENCY ADDRESS 6.** In total, investigators believe approximately 66,000 USDT of the approximately 131,879.59 USDT currently held in **SUBJECT VIRTUAL CURRENCY ADDRESS 6**, about 50%, is attributable to known and unknown victims.

87.    Exhibit 9, below, illustrates how **Victim-MH**'s funds were laundered into **SUBJECT VIRTUAL CURRENCY ADDRESS 6** using a string of virtual currency addresses.

**Exhibit 9 – Summary of the Flow of Funds from Identified Victims to SUBJECT VIRTUAL CURRENCY ADDRESS 6**



**Defendant Property's Involvement in Money Laundering Offenses**

88.    Exhibit 10, below, illustrates how **Victim-VP**'s and **Victim-MH**'s funds were laundered into the **SUBJECT VIRTUAL CURRENCY ADDRESSES** and the interaction between the **SUBJECT VIRTUAL CURRENCY ADDRESSES** and other virtual currency addresses used in furtherance of the money laundering scheme. Because several addresses were used to launder the funds of both victims, they are believed to have been victimized by the same group of subjects.

**Exhibit 10 – Summary of the Flow of Funds from Identified Victims to the SUBJECT VIRTUAL CURRENCY ADDRESSES**



89.     The victims identified in this investigation, along with suspected and unidentified victims, were defrauded as part of wire fraud schemes, in violation of Title 18, United States Code, Sections 1343 and 1349 when unidentified subjects knowingly participated in a scheme to defraud them, in part by using materially false and/or fraudulent pretenses, representations, and promises that their cryptocurrency deposits were for legitimate cryptocurrency investments, and these pretenses, representations, and promises were conveyed to the victims through the use of wire communications in interstate or foreign commerce—i.e., messages over various U.S.-based message applications, wireless carriers, and social media providers.

90.     In addition to committing these wire fraud violations, subjects and/or their co-conspirators also committed money laundering offenses. First, based on the investigators' experience in investigating CIF scams over the past several years, and based on significant amounts of open source reporting, almost all CIF scam operations involving the solicitation and initial transfer of victim funds are believed to emanate from foreign-based individuals, predominantly in Southeast Asia.[12] Therefore, the unidentified subjects are believed to have committed international concealment money laundering, in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i) by transferring funds from a place in the U.S. (victims' cryptocurrency purchased through U.S. virtual currency exchanges) to virtual currency addresses controlled outside of the U.S., knowing that the funds involved in the transfers represented wire

---

[12] *See e.g.,* Lily Hay Newman & Matt Burgess, *The Pig Butchering Invasion Has Begun*, WIRED (Sept. 30, 2024, 6:00 AM), https://www.wired.com/story/pig-butchering-scam-invasion/, ("Such "pig butchering" operations have largely been concentrated in Myanmar, Cambodia, and Laos, typically rooted in Chinese organized crime groups exploiting instability and poor governance in the region. . . . [P]ig butchering operations that are offshoots of the Southeast Asian activity have emerged in the Middle East, Eastern Europe, Latin America, and West Africa.")

fraud proceeds from U.S. victims, and to conceal the nature, location, source, ownership or control of the wire fraud proceeds.

91.     Furthermore, based on analysis of the transaction activity involving the subject-controlled addresses that first received the victims' funds, the multiple intermediary addresses that later received, commingled, and consolidated confirmed/suspected victims' funds (including with funds of unidentified origins), and the **SUBJECT VIRTUAL CURRENCY ADDRESSES** which has held and still currently holds over a million dollars' worth of cryptocurrency, these addresses were used in a coordinated fashion to make transactions designed to conceal the nature, location, source, ownership, or control of wire fraud proceeds in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

92.     Such transaction activity, for example, is seen through the transfer of victim funds, as displayed in Exhibit 10.  First, the victim funds were sent to a subject-controlled address from a cryptocurrency exchange. These addresses are provided to victims by the criminals as unattributed "0 Level" deposit addresses to evade identification or potential interference. Such is the case with the initial deposit addresses that were queried on IC3 to identify aforementioned victims. Additionally, these addresses are oftentimes only shared with one victim to reduce the likelihood that the address is flagged to law enforcement.

93.     Funds were then rapidly sent through multiple cryptocurrency addresses, often with multiple transactions on the same day. Once deposited into the 0 Level initial deposit addresses, it is common for the funds to flow quickly from address to address before reaching a consolidation wallet, where the funds might rest for a longer period, allowing criminals time to comingle those funds with other illicit gains before moving the funds again towards a cash-out point where they can convert the pool of funds to fiat currency.

94.    Funds were also sent through decentralized exchanges, like HiFi Swap, and, for a fee, converted into a different asset. Decentralized exchanges ("DEXs") allow users to swap one cryptocurrency type for another, often without having to provide any identifying information, so users can remain anonymous.

95.    All of the victim funds in this case were converted into USDT, which is very common as scammers are able to stabilize the value of their proceeds by converting them to a stablecoin, which pegs its value to the U.S. dollar. Tron is often the blockchain of choice for scammers and money launderers utilizing USDT. The Tron blockchain offers faster transaction speeds and accommodates large amounts of USDT; USDC, an additional stablecoin in which some of the victim funds were sent, is not available on Tron.

96.    Criminals will often conduct multiple otherwise unnecessary transactions in the transfer of funds, incurring transaction costs, to layer ill-gotten funds to ultimately conceal or disguise the nature, location, source, ownership, or control of those proceeds. The large number of quick transfers between these intermediary addresses and ultimately to **SUBJECT VIRTUAL CURRENCY ADDRESSES** is a strong indication that the movement of funds was performed in a manner meant to conceal or disguise the nature, location, source, ownership, or control of the proceeds of a specified unlawful activity (in this case, wire fraud). There is no reason, economic or otherwise, for legitimate businesses or individuals to conduct cryptocurrency transfers in the above fashion. Whether transferring Bitcoin (BTC) or USDT, each individual cryptocurrency transfer costs money. For USDT, that cost comes through the payment of transactions fees. It is reasonable to assume that businesses and individuals would strive to minimize those fees by conducting transfers with as few transactions, or "hops," as possible. Furthermore, each transaction

29

delays the whole process, defeating one of the key attributes of virtual currency as a quick means of exchange.

97.     These intermediary addresses have made many high-value transactions, followed by a pattern of rapid movement of funds with large corresponding withdrawals. Each intermediary address has a zero, or very low, USDT balance. From the time of these intermediary addresses first use each transferred approximately millions of dollars worth of cryptocurrency. These intermediary addresses each have direct and indirect exposure[13] to other known CIF addresses, addresses with community complaints made in a reliable blockchain analytics tool used by law enforcement and the private sector, addresses linked to reported fraudulent websites, and addresses that have held funds frozen by a stablecoin issuer.

98.     Additionally, based on the investigators' experience investigating other CIF scams, the transaction patterns displayed in this investigation are very commonly seen in CIF laundering investigations, with victims' funds from multiple different deposit addresses being funneled into a common consolidation address (e.g., the cryptocurrency addresses 0xcc21 or TEiZ) before being sent to multiple additional intermediary addresses prior to being deposited into the **SUBJECT VIRTUAL CURRENCY ADDRESSES**. The common flow of the victims' funds shows that these addresses were part of a network of addresses that were used to receive and conceal wire fraud proceeds.

99.     Criminals involved in the laundering of proceeds from scams such as CIF do not typically commingle clean funds with stolen funds outside of the purpose of further laundering the

---

[13] "Direct exposure" refers to when a virtual currency address directly receives funds from or directly sends funds to another address. "Indirect exposure" measures the services and entities that make up the origins or destinations of funds in a specific virtual currency address' transactions in cases where there are non-service addresses (e.g., unhosted addresses) between the specific virtual currency address and those services or entities.

CIF funds. Therefore, even if not all of the **Defendant Property** in the **SUBJECT VIRTUAL CURRENCY ADDRESSES** are directly traceable to known victims, all funds being deposited into the **SUBJECT VIRTUAL CURRENCY ADDRESSES** are likely to consist of the proceeds of cryptocurrency investment fraud schemes, or similar scams, and are commingled for the purpose of concealing, disguising, and laundering the funds.

### Ownership of the SUBJECT VIRTUAL CURRENCY ADDRESSES

100.    Tether stated to investigators that on May 28, 2026, an individual utilizing the email address notwo2256@gmail[.]com and alias "NoTwo" inquired about the status of **SUBJECT VIRTUAL CURRENCY ADDRESS 1** and **SUBJECT VIRTUAL CURRENCY ADDRESS 2**. The individual further requested instructions on how to unfreeze the two addresses.

101.    On June 1, 2026, the USSS emailed the email address provided by Tether to provide an opportunity to claim ownership of the addresses. On June 1, 2026, the email address responded to investigators and wrote that the individual controlling the email address is not the related person with the frozen addresses and was merely communicating on behalf of his friends, who are not proficient in English. The individual stated he would contact his friends further about the addresses.

102.    On June 11, 2026, Google provided records to the USSS pertaining to notwo2256@gmail[.]com. The records show the email address was created in May of 2022 and has had logins from internet protocol addresses serviced by internet service providers in Hong Kong and Mozambique, including Space Exploration Technologies, the company which provides internet service using Starlink. The recovery telephone number for the email address also appears to be a Hong Kong telephone number based on its telephone code.

103.    On June 10, 2026, the USSS received an email from tzl980a0@gmail[.]com with alias "太阳" who requested the funds held in **SUBJECT VIRTUAL CURRENCY ADDRESS 4** be unfrozen. The user stated that he had "not participated in any illegal activities such as money laundering, terrorist financing, hacking, or fraud" and that the funds in the frozen address were sent from another address of his. He provided a screenshot of an apparent wallet which holds **SUBJECT VIRTUAL CURRENCY ADDRESS 4** along with a screenshot of transaction information for TDfw.

104.    On June 11, 2026, the USSS responded by requesting information and proof relating to the source of funds, transaction details, and purpose of use of the funds and cryptocurrency address. As of July 2026, the user has not provided information to support his claim of legitimate funds. Approximately 86% of the funds which are held in **SUBJECT VIRTUAL CURRENCY ADDRESS 4** are directly traceable to **Victim-VP**'s deposit into the scam.

105.    As of July 2026, the USSS also has not received any proof relating to the source of funds, transaction details, and purpose of use of the funds from any individual claiming ownership of any of the other **SUBJECT VIRTUAL CURRENCY ADDRESSES**.

## COUNT ONE – FORFEITURE OF DEFENDANT PROPERTY
### (18 U.S.C. § 981(a)(1)(C))

106.    The **Defendant Property** includes property constituting or derived from proceeds traceable to wire fraud and conspiracy to commit wire fraud, in violation of 18 U.S.C. §§ 1343 and 1349.

107.    Accordingly, the **Defendant Property** is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(C).

## COUNT TWO – FORFEITURE OF DEFENDANT PROPERTY

## (18 U.S.C. § 981(a)(1)(A))

108.    The **Defendant Property** constitutes property involved (a) domestic and international concealment of money laundering transactions committed in violation of Title 18, United States Code, Sections 1956(a)(1)(B)(i) and 1956(a)(2)(B)(i), (b) a conspiracy to engage in money laundering, committed in violation of Title 18, United States Code, Section 1956(h).

109.    Accordingly, the **Defendant Property** is subject to forfeiture to the United States under 18 U.S.C. § 981(a)(1)(A).

## PRAYER FOR RELIEF

WHEREFORE, the United States of America prays that notice issue on the **Defendant Property** as described above; that due notice be given to all parties to appear and show cause why the forfeiture should not be decreed; that this Honorable Court issue a warrant of arrest *in rem* according to law; that judgment be entered declaring that the **Defendant Property** be forfeited to the United States of America for disposition according to law; and that the United States of America be granted such other relief as this Court may deem just and proper.

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

/s/ Rick Blaylock, Jr.
Rick Blaylock, Jr.
TX Bar No. 24103294
Assistant United States Attorney
Asset Forfeiture Coordinator
United States Attorney's Office
601 D Street, N.W.
Washington, D.C. 20001
(202) 252-6765
rick.blaylock.jr@usdoj.gov

33

**VERIFICATION**

I, John Schmitz, a Special Agent with the United States Secret Service, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing Verified Complaint for Forfeiture *in rem* is based upon reports and information known to me and/or furnished to me by other law enforcement representatives and that everything represented herein is true and correct.

Executed on this 20th day of July 2026.

_____
John Schmitz
Special Agent
United States Secret Service